May it please the Court. My name is John G. Jacobs. I represent the plaintiff appellant. With me at council table is my partner, Brian Colton. I should like to reserve five minutes for rebuttal. The district court ruled against the plaintiff in this case on two bases. One, ruling that there was no automate automatic telephone dialing system, an ATDS, and that there was prior express consent. I would like to address those two points in turn. The court ruled that there was no ATDS here, based on a grammatical and punctuation-based interpretation that had not been even raised by the defendants, and ended up That had not or is not. It is now, right? It is now, absolutely. Resulting in an interpretation of the statute, being reduced to this, an automatic telephone dialing system means equipment which dials telephone numbers that were randomly or sequentially generated. That's all that matters under the district court's new interpretation. If it isn't, all that matters is if you used a randomly or sequentially generated phone number. If you didn't, we don't care what you did. With respect, we believe that the district court made an interpretation without employing the normal rules of construction, that you look at a statute holistically, you look at all of its parts, you look at its purpose, you look at its intent. And the court even acknowledged that, granted, this doesn't make sense, that you can put in a list of 100,000 names and unleash that on the world, and that's okay, but if you randomly generate 100,000 names and unleash it on the world, that's a violation. ER-26, she says, yeah, that may not make sense, but that's how I read the statute. You could go to Congress and say, this doesn't make sense, you should change it, and Congress might say, yeah, you're right, we'll change it, but I read the statute that way without taking account of all the other factors against that. Well, the reason that she did that, these messages were sent to specific, finite, non-random, and non-sequential numbers, weren't they? Yes, that is correct. And so she had messages which were sent to specific people, there was a finite number, they weren't random, they weren't sequential, they were all belonging to next tone subscribers, but that didn't seem to be random in any way, and so the judge was concerned about that. I guess if I'm going to read the statute, I want you to explain to me how I read the statute other than she read it. Because if I put, I mean, I don't suggest that I'm a textualist in any way, but I have to read this statute and understand if it's clear and unambiguous given the language in it, then I interpret it based on what it is. And we have to store or produce telephone numbers to be called, comma, using a random or sequential number generator. Now, that comma there doesn't seem to me that it can be read to not apply to store or produce if that comma is there. So how do I get around that? That's the question. With respect, Your Honor, we all know that the FCC has read this and interpreted it exactly the way we do. How did they do it? How does anyone do it? Well, one beginning point, Your Honor. How about just a minute? You say the FCC read it and interpreted it exactly the way you did. Yes. Did they do it in any regulation? In a rule. Yes, Your Honor, in a final rule. What do you, why do you call it a final rule? That's what, that's what it is called in, in July 25th. They ever put a regulation together? They had a regulation. They then issued a notice of intended rulemaking and said here's a specific question. Is it a violation? Is it an ATDS if you just put in a list of numbers and then automatically dial them? They had comments on that. Then they issued a final order. And then a month later, or at the end of the month, they issued a rule that said it is a violation. So if I find the statute to be ambiguous, then I might say this is a pronouncement of the FCC. And therefore, Chevron deference should apply. Isn't that the only way I get to that? The way you get to the FCC is to suggest the statute is ambiguous. Or it is not clear. Yes, Your Honor. If I find it clear, then I don't even take into account what they say. If, if you find that Congress has clearly spoken on the precise issue at hand, then you can't- By what they've written, by what they've passed. That's right. And you cannot do that, I would submit, Your Honor, with regard to lists, if I might. The, the thing that both the defendants and the district court seem to deal with is, and by the way, in regard to that, the district court acknowledged Your Honor's point saying, if the FCC had spoken to this, I would, I would give it some deference. But I don't think they did. I think they were talking about predictive dialers and that they didn't even talk to this issue. But that's, if I may say, explicit. The Court was doubly wrong on that. First, in paragraphs 23 and 24 of their notice, they spoke only of this. This is what we want to talk about and decide on, and then they issued a final rule with it. In paragraph 26, they said we want to talk about predictive dialers as well. And they ended up making special rules about predictive dialers. But number two, a predictive dialer, and it goes to the point I was getting ready to speak to a second ago, a predictive dialer is simply an added feature that you can put on to an automatic telephone dialing system if you so chose. And the FCC was explicit about that. And that's the point. Both the defendants and the district court failed to appreciate that it is an automatic telephone dialing system, not a single machine. It has components. A random number generator is a component of an automatic telephone dialing system. And with respect, Your Honor, a random number generator generates numbers. It does not store them. It does not dial them. Other components of the system have to do that. And what does store mean? Let me ask you another question. Yes, Your Honor. Does this equipment have the capacity to do, to store or produce the telephone numbers to be called using a random or sequential number generator? Exactly. Does it have the capacity? Exactly the point with my next point. Exactly, Your Honor. Yes is the answer. And the, we argued below and we argued here on page 13 of our initial brief, and I don't remember what page of our reply brief, that it clearly had the capacity to store a randomly generated number. As we said, a number is a number. Once you come up with area code 415-555-1212, I don't care how you got it. I don't care if you bought it from somebody who bought it from somebody who bought it from Nextones, or if you randomly generated, that's the number. And you can store it, and you can dial it, and that's what happened. And we argued that explicitly, and the defendant never responded. Instead, on page 23 of their opposition brief, they say inexplicably, defendants concede, plaintiffs concede that the system here did not have the capacity to store numbers. I don't know where they got that. But the second point about that, Your Honor, it was the defendant's burden as the summary judgment movement to prove that their system did not have the capacity to randomly generate or to store, and they did not do that. Indeed, the record, the evidence in the record, of course, number one, shows clearly they had the ability to store any kind of a number. I don't care what it was, random or from a list, they could store a number. But number two, the evidence in the record says they used Excel, Microsoft Excel, and Microsoft Excel can randomly generate numbers. So they lose on both counts, even under the district court's interpretation. The district court, the defendants have no answer, by the way, why in 92 the cell phone companies had to go to the FCC to get an exclusion, to get an exemption so that they could contact their own customers about their own accounts for free. Now, there is no possibility that AT&T would use a random number generator to contact its customers, of course not. You would only use a list. Their only response, defendant's only response to that is to say in a footnote, we don't, their thought process is irrelevant. They don't have an answer. Also, in the same vein, the prior consent, prior express consent requirement. You would never, what are the odds of ever randomly generating 100,000 names and sending them to people who have given you prior express consent? It makes no sense. That requirement of the statute only makes sense if it applies to lists. But, you know, Mr. Jacobs, it seems to me that randomly selects means some kind of a machine or a process by which you just pick out numbers without any meaning or anything else and you get a whole bunch of numbers. But if you buy from someone a full set of specified numbers, then it doesn't seem to me you've randomly selected. You just bought a bunch of specific numbers. Your Honor, I apologize, but the words randomly select are nowhere in the statute. Okay. It says, to store or produce telephone numbers to be called using a random or sequential number generator. And as I say, a random number, I'm sorry. But how do you, how does it, you've got a list, and maybe you could call them sequentially. So that would satisfy it. Yes. But once you've got the list, does the generator or whatever this thing does just pick numbers at random off the list? No, no, it makes up numbers. Makes up numbers. Yes. Algorithms just makes up numbers. Oh. Absolutely. That's what they do. Random number generator. But I emphasize again, Your Honor, it is a component of an automatic telephone dialing system. And the words to store would have no meaning unless it included lists. As the FCC said, if I could move quickly. You go ahead. If I could move quickly to the issue of consent. You know, Senator Hollings could not have been clearer when he said, as long as the consent is expressly given to the particular entity making the call. And he said, sure, you can put into a contract that by signing, you are agreeing, you're giving your express consent to receive a computerized call concerning that service or product. Of course, that didn't happen here. They checked a box that said, yes, I would like to receive promotions from Nextone affiliates and brands. That's all it said. Okay? By the way, the word brands never appears again anywhere in any of Nextone's things. Anywhere in its website, the word brands does not appear. Affiliates appears quite a bit. And they say in the contract, you're really suggesting then that affiliates has been defined and brands has not. Yes, that is true, Your Honor. Common sense means we all know what a brand is. Ford, Coke, Pepsi, Dell, we know what a brand name is. Nextone, but has to come, again, from a brand. Somehow, through able advocacy, I would suggest, the district court was convinced that putting the phrase, could be Nextone, at the end of this e-mail, branded the e-mail and turned it into a verb, like you brand a cow. That's not what this Nextone agreement said. It said, I would like to receive promotions from Nextone's affiliates and brands. No one argues that Simon & Schuster is a Nextone's brand. That makes no sense. The student. Well, is it an affiliate? No. And even the district court didn't buy that. Now, if you look at the definition of affiliates, under the statute, 47 U.S. Code 153, it says an affiliate is somebody that you own more than 10 percent of their stock. The common parlance of affiliates is not that. But even within this website, the only reference to affiliates is, would you like to become an affiliate and sell our ringtones as well, and make money off of it? So. Thank you very much. Thank you, Your Honor. I appreciate your argument. May it please the Court, Peter Winnick of Latham & Watkins for the appellees. And I'm pleased to introduce my colleague, Barry Blonning, who is with me here as well. There are four independent reasons why the lower court. Mr. Winnick, before you launch into your four, I think I ought to be up front and tell you that I think the district judge misread the statute. And I'd like to see why you agree with the district judge. The statute speaks in terms of capacity. It doesn't speak in terms of what actually happens. And it seems to me clear that this system had the capacity to generate numbers randomly or sequentially. The fact that it didn't is irrelevant. Now, can you tell me why that's not an accurate reading of the statute? Sure. I'd be pleased to, Your Honor. Thank you. First of all, the capacity argument is one that was made for the first time by the appellants in their reply brief in this Court. Now, just forget that. Before a court, we have to interpret the statute according as we read it. So your first argument is irrelevant. The next, Your Honor, with respect, the next argument is that the statute talks about equipment that is used to place a call. No. It's a set of – should I read it to you? Should I read it to you? It says, Term, automatic telephone dialing system, means equipment which has the capacity. It doesn't use the word use, which has the capacity. You've got that in mind? Yes, Your Honor. All right. Then what words are you fixing on? Statute in 227b1 says it's unlawful to make a call, and I'll skip some words, but it's unlawful to use an automatic telephone dialing system. And I think the focus is on what equipment is used in that particular case. Of course. And then we look for the definition. It's a system that has a capacity. Your Honor also said in your question that the equipment in this case had the capacity to generate random telephone numbers. And there's no record evidence of that. There's no record evidence of that. It's a computer, isn't it? Well, there was no single box that was the equipment. There were various pieces of equipment used by various persons. Are you denying that it has the capacity to generate random numbers? There is no record evidence. There's no evidence on that. There's no record evidence of that. And in fact, the honest answer is, I don't know, Your Honor. I truly don't know. Mr. Jacobs said that Excel And are you denying that it has the capacity to do it sequentially? To generate sequential numbers? I don't know if any of the equipment used Well, it was able to follow these lists. Why couldn't it follow a set of numbers? I don't know if any of the equipment in this case had the capacity to generate random numbers or sequential numbers. Well, let me ask you this. If there's any record on it. It has the capacity to follow a list. I take a sequence as a sequence of numbers. So if you gave them a list running 1 to 100, it could follow that list, couldn't it? Well, that's what happened in this case. A list was input. All right. Reselected numbers. But I'm just talking about capacity. It has capacity to follow a list. Among possible lists is a sequence of numbers. Therefore, it has capacity to store and generate numbers that are sequentially called. I think with respect, I think the notion of sequential numbers in the statute, like random numbers, is a The key concept is they're made up numbers. They're not preselected, rationally selected numbers. You know, I'm trying to read the statute as any person would read it. A sequence to me is a sequence of numbers. Well, the legislative history, which the court. No, no, we don't want to hear about that. Well, in Chevron step one, the court is supposed to look at the language and the legislative history. We don't want to get to Chevron. I want to get to stay with the statute. Explain to me why this machine doesn't have the capacity that it seems to me Plano does have. You know, you've been talking for a number of minutes, and I've interrupted you, but I haven't heard a word from you as to why it doesn't have that capacity. Well, I think I've said that the record, there is no record evidence. Answer my question about it's able to follow a list, right? The equipment used in this case was able to dial numbers from a pre rationally selected list. Yes. Not made up. So if instead of those numbers, it had been given a set of numbers sequentially arranged one to 100, it could have followed that. Could it not? If a different if a different piece of equipment had generated random numbers or sequential numbers and that list had been fed into this equipment, that didn't happen here. No, I know it, but it had the capacity to do it. Does it not? Yes. It certainly could have followed that list, too. But once you admit that, of course, it has the capacity. That's the end of the argument. It doesn't have the capacity to generate. There's no record evidence that the equipment had the capacity to generate the numbers, Your Honor, but in any event. I guess the bottom line is, I mean, what my colleague is trying to drive here, we're interpreting a statute. We have a lot of FCC stuff in the what we call rule, and we're trying to look at what we've got here. But if we're backing up and suggesting that we're really talking using automatic dialing system equipment, and then we say equipment which has the capacity, I'll be fair. I came to the same point you did. I'm not sure the record suggests that we have enough here to say whether it has the capacity to do this, but the district court didn't focus on capacity. It focused on the second part of the statute, which had the comma, and it said, well, there's no way with a specific finite non-random or non-sequential number that even meets the standard. But the thing that worries me, and if you're suggesting the record doesn't say anything about it, is does it have the capacity to do this? If there's nothing in this record about that, isn't my decision easy, send it back and let the district court deal with that? Well, my view of the proper interpretation, I understand Your Honor's question, my view of the proper way to interpret the statute, both the text and with resort to the legislative history, is that the concept of capacity has to be viewed with respect to the actual use of the system. Well, that's ridiculous. The word capacity means inability. It doesn't mean actual use. Mr. Winnick, you're struggling. I appreciate the difficulty because I think you're just in a hole. But sometimes the best strategy when you're a hole is I am in a hole. But go on if you think you can make headway. Your Honor, you and I just have an honest disagreement on this. But, you know, let's look at the definition here, to store or produce. Your claim was it couldn't store or it couldn't produce. Here, there's no record evidence that any random – I'm sorry, that the equipment No, no, I'm asking you, about this particular equipment, which we know can use a list, could it use a list of – could it store a list of numbers? Could it store a list of numbers? It's some other piece of equipment generated? I think we've already said that the answer to that is surely yes. And so it has capacity to store. That's what the statute requires. And the way we interpret it is that the equipment has to generate or produce random or sequential numbers. And if I can touch on – No, the words have – follow the statute. It has the capacity to store. You've just conceded it has the capacity to store. You don't need to say anything more. You've conceded it. Well, except that in my view of the statute, the actual use is relevant and – It does what? The actual use that was put in that – Where is that in the definition? Well, if you look at – if you look at, well, as I've said already, the term using an automatic telephone dialing system – Oh, well, that's – you're not looking at the definition. Moreover, Your Honor, the – Moreover? You haven't done anywhere. I think that the – if I can resort to the legislative history, it provides context – Well, it's not very popular these days. Well, it provides context for what Congress intended when it passed this Act. And there is – Congress was briefed on various specific abuses, all of which had to do with made-up numbers, calls made to made-up numbers. There's no – there's no generalized concern articulated in the legislative history about calls made to any numbers at all without human intervention. Indeed, calls to residences by automatic telephone dialing systems are not banned in this statute. It's a very narrow, carefully crafted statute that addresses specific concerns that were called to Congress's attention. And indeed, we've heard a lot about what the FCC did in 2003. But in 1992, the first time the FCC looked at this statute, it very clearly – it very clearly held that calls made – that the statute only proscribed calls made to randomly or sequentially generated numbers. And to the extent that the FCC flip-flopped in 2003 and held something different, there's no reason basis given for the FCC's position at all, no reason basis given for any shift in position. Do you want to tell us why Mrs. Satterfield gave express consent to this? Sure. She – Ms. Satterfield went to the Nextone's website, and she had a choice. She wanted to download a ringtone for her son. She could have paid for the ringtone, or she could have gotten it for free. And she affirmatively checked the box to get it for free. And it said that, I would like to receive promotions from Nextone's affiliates and brands. And what was this? Well, the record shows, Your Honor, that Nextone's testified – the unrebutted record shows that Nextone's testified that they approved the use of its brand on this promotion. What was the brand? The brand was Nextone's. It's not exactly Nextone's. Because the E is – Yeah. It's not the same. Well, I – And you say that was a brand. First of all, Nextone's testified that that was their brand. There's no testimony from Ms. Satterfield that she was confused in any way by the lack of an E there. That's not the issue. The issue is, did she consent expressly to this kind of thing? Most people, and I think interpreting a word like that, you use common sense, this wasn't a brand. Well – It certainly wasn't an affiliate, was it? Well, they were not affiliates in the narrow legal sense. In the corporate sense, yes. But aren't we talking law? Pardon me, I'm sorry. Talking law when we talk about affiliates? Well, we're talking about the contract between Nextone's – That's what the parties intended. And clearly – What does the contract say an affiliate is? Well, I don't think they're – I mean, they entered into a contract. This was the contract she entered into with Nextone's. And this is the contract that says you have the permission to send promotions from Nextone's affiliates and brands. So it doesn't seem to me that I have to get out of the contract at all unless I can't find affiliates or brands in the contract. Why do I have to leave the contract to get outside of the contract language if I'm interpreting the contract? What language would suggest that in law? Well, I don't know that – I think the question is what did the parties intend when they – Well, but there's no question about the parties' intent, counsel. If we're really talking about a contract that's clear and unambiguous, I don't have to go take all these other definitions of what they are. It seems to me, then, affiliates was defined in the contract, wasn't it? Well, I agree with Your Honor's articulation. If the – you don't go outside the contract – Was affiliates defined in the contract? I don't believe it was, Your Honor. In the – in the page that she checked, I don't believe that it was. There's reference to affiliates elsewhere. But just a minute. You're suggesting that this contract that she entered into is only the page she checked? Come on. I was not – I mean, I can understand a little, if you will, amnesty even from my counsel in your answer to the question. But I've got a contract here. I'm supposed to be interpreting the contract. I read all of the contract language. Affiliate is well defined in that. And you're suggesting now I have to limit the contract to only the page she signed? I didn't mean to suggest that, Your Honor. I do realize elsewhere affiliates is covered. And that's why the lower court, I think, went off on the brands. Well, that's why I thought they did. And then I said to myself, how do I get to that definition of brands? That the district court used. Well, I think that – I think the way you get there is to apply a common sense meaning to the term brands and look at the party's testimony as well, which is unrebutted. The Nextone's people said that this clearly bore their brand. And Ms. Satterfield has no contrary understanding at all in the record. If I may, in the last – So you're suggesting then that I interpret brands based on the factual evidence in the record and that it is uncontradicted? I think – Or do I send it back for a trial on that matter? Two points, Your Honor. One, the common sense meaning of brands. And second, the factual evidence in the record, which is undisputed. There's no material issue of fact on the meaning of brands. And in the four seconds remaining, charge for call, it's undisputed that Ms. Satterfield did not incur any marginal or incremental cost for receipt of this call. And for the reasons explained in the briefs, we believe that the statute and the legislative history clearly establish that the only reason cell phone calls are in there is because – is because users can be charged for the call. Thank you. Thank you. I have only one point in reply, Your Honor. You've got 30 seconds. That's all – that's all I want. Repeatedly, my brother said there is no record evidence as to whether or not their system had the capacity to store or randomly generate either one. Therefore, they lose because they are the summary judgment move-ants. It is their burden to prove that they did not have the capacity. We argued it at page 6 and 7 of our opposition brief below. We argued it at page 13 of our initial brief before this Court. We argued it at page 5 of our reply brief. It's their burden, admittedly, by counsel's mouth. They did not put in any evidence of that. They lose. Thank you. Thank you very much for a good argument from both of you. We appreciate it very much. Case 07-16356, Satterfield v. Simon & Schuster, is now submitted. And we thank all counsel for coming and for your good arguments. And we appreciate you coming and helping us with some very difficult cases. Thank you very much.
judges: Noonan, Thompson, Smith